AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the

Eastern District of California

<table>
<tr><td>In the Matter of the Search of<br>One light silver Apple iPhone in a red case,<br>and one gray Apple iPhone in a brown case,<br>currently in possession of law enforcement<br>located at 10151 Croydon Way, Sacramento,<br>California 95827</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.    2:26-sw-0290 CKD</td></tr>
</table>

**FILED**

**Apr 01, 2026**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENTS A-1 and A-2, attached here and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached here and incorporated by reference.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

**SEE AFFIDAVIT, attached here and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice ___30___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Sworn to and signed telephonically.

Thomas Barton, FBI Special Agent
*Printed name and title*

Date: ___March 31, 2026 at 1:56 pm___

*Judge's signature*

City and state:  Sacramento, California

Carolyn K. Delaney, Chief U.S. Magistrate Judge
*Printed name and title*

ERIC GRANT
United States Attorney
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. |
|---|---|
| One light silver Apple iPhone in a red case, and one gray Apple iPhone in a brown case, currently in possession of law enforcement located at 10151 Croydon Way, Sacramento, California 95827 | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT |

I, Thomas Barton, being duly sworn, hereby depose and state as follows:

### I.    PURPOSE

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search authorizing the examination of property – the below-identified electronic devices – which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

   A.    One light silver Apple iPhone in a red case (the "**Target Cell Phone 1**"), described in further detail in Attachment A-1.

   B.    One gray Apple iPhone in a brown case (the "**Target Cell Phone 2**"), described in further detail in Attachment A-2.

2.    The target cell phones (collectively referred to as "**Subject Devices**") are in the temporary custody of the Sacramento County Sheriff's Office and are described more particularly in Attachment A, which is attached here and incorporated here by reference.

AFFIDAVIT

1

3.     Based on the information provided in this affidavit, it is my opinion that there is probable cause to believe that David TOWNER (hereinafter "TOWNER"') violated 21 U.S.C. § 841(a)(1) (distribution, and possession with intent to distribute, a controlled substance) and 21 U.S.C. § 846 (conspiracy to distribute a controlled substance).  On March 18, 2026, the Honorable Carolyn K. Delaney, Chief Magistrate Judge, issued a Criminal Complaint against TOWNER for two violations of 21 U.S.C. § 841(a)(1) based upon two controlled purchases where he acted as the supplier of methamphetamine to Felicia Trotter.  *See United States v. Towner*, Mag. No. 2:26-mj-0027 CKD, ECF 1.  Further, there is probable cause to search the items described in Attachment A for evidence of these crimes as further described in Attachment B, which is attached here and incorporated here by reference.

## II.     INTRODUCTION AND AGENT BACKGROUND

4.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since June 2022.  I am currently assigned to the FBI's Sacramento Division, Violent Crime Safe Streets Task Force.  I have been assigned to this squad since 2024, with prior assignments including White Collar Financial Fraud, and the Special Operations Group. As a Special Agent of the FBI, I am authorized to investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States.

5.     I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia My training consisted of twenty-one weeks of New Agent Training classes, during which I received instruction on various aspects of criminal and national security investigations. As part of my training, I received extensive instruction in the areas of criminal law; firearms; rules of evidence; interview techniques; physical surveillance; working with confidential informants; writing affidavits; executing search warrants; analyzing phone records obtained from subpoenas, search warrants, pen registers and trap and trace devices; and collecting and processing evidence. In addition, I have received specialized training in firearms and narcotics investigations, gang investigations, and crimes against children investigations. Throughout my law enforcement career, and as part of my participation in this investigation, I have spoken with, worked with, and gained knowledge from experienced federal, state, and local investigators.

AFFIDAVIT

2

6.      The facts and information in this affidavit are based on my personal knowledge, my training and experience, information I learned from other law enforcement officers and witnesses, and review of various documents and records. Furthermore, this affidavit does not contain all the facts known to me about the events described in this affidavit.

7.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. In addition, this affidavit is based on my conversations with other law enforcement agents with whom I have discussed this matter and who have participated in its investigation.

### III.      STATEMENT OF PROBABLE CAUSE

#### A.      Summary of Investigation of David Towner

8.      In February 2026, the Sacramento Area Intelligence Narcotic Team (hereinafter "SAINT"), conducted two controlled purchases for methamphetamine through Felicia Trotter from David TOWNER. SAINT Detectives received information from an undercover Task Force Officer with the United States Postal Inspection Service (hereinafter "UC-2") that Felicia Trotter was trafficking methamphetamine in the Sacramento, California area. As detailed below, on February 17, 2026, TOWNER supplied approximately 5.1 pounds of methamphetamine to Felicia Trotter, who in turn sold that methamphetamine to an undercover officer (hereinafter "UC-1"). In addition, on February 26, 2026, TOWNER supplied ten pounds of methamphetamine to Felicia Trotter who in turn sold that methamphetamine to UC-1.

#### B.      February 17, 2026 – Towner supplies five pounds of methamphetamine and Trotter distributes that methamphetamine to an undercover agent

9.      UC-2 coordinated a controlled purchase from Trotter for five pounds of methamphetamine for $7,500, to be completed by UC-1. On February 17, 2026, at approximately 1:30 p.m., agents provided UC-1 with $7,500 in recorded buy funds, and an electronic recording/transmitting device. UC-1 was under continuous surveillance during the controlled purchase and drove to 8908 Elder Creek Road, in Sacramento (the "buy location").

10.      At approximately 1:34 p.m., a white Kia Forte, displaying California license plate number 8ZGU059, registered to Felicia Trotter, arrived at the buy location. Trotter exited the vehicle

AFFIDAVIT

3

and entered the vehicle driven by UC-1. Trotter identified herself as Felicia and UC-1 confirmed it was Trotter based upon UC-1 viewing a known photo of Trotter before the drug deal. Trotter counted the money and told UC-1 that she would go nearby to pick up the methamphetamine. Trotter entered her Kia Forte and departed.

11.    Trotter arrived, while under continuous surveillance, near 8581 Younger Creek Drive in Sacramento. Surveillance agents observed a black Audi SUV park on Younger Creek Drive facing Trotter's vehicle. Agents observed David TOWNER exit the Audi carrying a black bag, stepped out of view of surveillance, and then return to the Audi with the same black bag appearing to be empty of its contents. Trotter departed Younger Creek Drive and drove back to the buy location, arriving at approximately 2:31 p.m. TOWNER's observed behavior is consistent with TOWNER supplying methamphetamine to Trotter to be sold to UC-1, especially considering Trotter's admission to UC-1 that she was leaving to get the methamphetamine and, consistent with that admission, agents watched Trotter retrieve drugs from TOWNER and then return to the buy location.

12.    Once Trotter arrived back at the buy location, UC-1 entered Trotter's vehicle and retrieved five sealed plastic bags of suspected methamphetamine. UC-1 exited her vehicle, entered UC-1's vehicle, and departed. Surveillance agents followed UC-1 and met at a predetermined location to retrieve the suspected methamphetamine. Agents field tested the methamphetamine supplied by TOWNER and sold by Trotter on February 17 using a TruNarc device; the device returned a positive result for the presence of methamphetamine.

C.    **February 26, 2026 – Towner supplies ten pounds of methamphetamine and Trotter distributes that methamphetamine to an undercover agent**

13.    SAINT Detectives received further information from UC-2 that Trotter continued to actively sell methamphetamine in the Sacramento area and was acting as a runner for Nathan Pappas, who is currently in custody with the California Department of Corrections and Rehabilitations. UC-2 coordinated a controlled purchase through Trotter for ten pounds of methamphetamine for $15,000, to be completed by UC-1.

14.    On February 26, 2026, at approximately 4:30 p.m., agents provided UC-1 with $13,000 (per Pappas's instruction, $2,000 of the $15,000 was wired to Pappas separately) in recorded

AFFIDAVIT

4

buy funds, and an electronic recording/transmitting device. UC-1 was under direct surveillance during the controlled purchase and drove to 8908 Elder Creek Road in Sacramento (the "buy location").

15. At approximately 4:35 p.m., surveillance agents observed Trotter's white Kia Forte arrive at the buy location. This is the same car that Trotter used for the February 17 drug deal. UC-1 arrived at the buy location at approximately 4:53 p.m. and parked next to Trotter's vehicle. Trotter exited her vehicle and entered UC-1's vehicle. Trotter spoke with Pappas on the phone in the presence of UC-1. Trotter confirmed with Pappas that the money was good. At that point, Pappas told UC-1 that Trotter would retrieve the methamphetamine and return shortly. At approximately 4:59 p.m., Trotter exited UC-1's vehicle, entered her Kia Forte, and departed. Surveillance followed Trotter to 8581 Younger Creek Drive in Sacramento. This is the same location Trotter drove to meet TOWNER during the February 17 drug deal.

16. At approximately 5:02 p.m., surveillance observed Trotter arrive in the parking lot of 8581 Younger Creek Drive. Trotter parked next to a blue Toyota Camry, displaying California license plate number 9TYF510, registered to Anisa Gains at 1851 Danbrook Drive, Sacramento. David TOWNER is also listed as a resident of 1851 Danbrook Drive and a known associate of Anisa Gains.

17. Surveillance observed David TOWNER near the rear passenger side of the blue Toyota Camry. Surveillance watched TOWNER retrieve a brown paper bag from the Camry and walk towards Trotter's vehicle. TOWNER entered the front passenger seat of Trotter's vehicle. Surveillance then saw TOWNER exit the vehicle a short time later. He appeared to only be carrying money in his hands. Trotter then placed a black bag in her vehicle's trunk while TOWNER departed on foot toward the business. Like the drug deal on February 17, TOWNER's observed behavior is consistent with TOWNER supplying methamphetamine to Trotter to be sold to UC-1.

18. Trotter departed at approximately 5:04 p.m. and returned to the buy location. At approximately 5:09 p.m., Trotter arrived at the buy location and entered UC-1's vehicle while carrying a black bag. The bag contained five vacuum-sealed packages, at approximately two pounds each, for a total of approximately ten pounds of suspected methamphetamine. Trotter exited the vehicle at approximately 5:11 p.m., entered her Kia Forte, and departed.

AFFIDAVIT

5

19.    UC-1 departed at approximately 5:12 p.m. and met with agents at a predetermined location who recovered the suspected methamphetamine, which was later submitted for further testing.

**D.    March 19, 2026 – Search Warrant executed at 1851 Danbrook Drive, Sacramento, California**

20.    On March 18, 2026, law enforcement obtained a search warrant issued by the Honorable Judge M. Gary, Sacramento County Superior Court, for several locations, including a residence connected to TOWNER located at 1851 Danbrook Drive in Sacramento (this is the address listed on the registration for the blue Camry that TOWNER used to deliver the ten pounds of methamphetamine on February 26). Separately, agents obtained a federal arrest warrant for David TOWNER in the Eastern District of California.

21.    On March 19, 2026, the Federal Bureau of Investigation executed the search warrant at 1851 Danbrook Drive without incident. Detectives with the Sacramento County Sheriff's Office ("SCSO") searched 1851 Danbrook Drive and located six cellular phones.  Two of the devices located were the **Subject Devices.  Target Cell Phone 1** was located on top of the bed in the master bedroom. **Target Cell Phone 2** was located on top of the bathroom counter in the master bathroom. Law Enforcement Officers questioned Anisa Gains, a resident of 1851 Danbrook Drive and a known partner of TOWNER, about the owner of each phone and she told officers that the **Subject Devices** belonged to TOWNER.[1] The **Subject Devices** were seized and booked as evidence by the SCSO at 10151 Croydon Way, Sacramento, California 95827.

22.    At the time of the warrant, agents encountered TOWNER at 1851 Danbrook Drive during the execution of the search.  Agents arrested TOWNER and law enforcement transported him to the Sacramento County Main Jail.

///

///

///

---

[1]    According to Assistant United States Attorney Jason Hitt, Gains confirmed her relationship to TOWNER and offered to act as a third-party custodian for TOWNER during bail hearings held in TOWNER's federal case.

AFFIDAVIT

6

## IV.     <u>TECHNICAL TERMS</u>

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

a) Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone, or smartphone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b) Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c) Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include

AFFIDAVIT

various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d)      GPS: A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e)      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f)      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular

AFFIDAVIT

8

networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

h)    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

g)    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24.    Based on my training, experience, and research, I know that the **Subject Devices** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and tablet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## V.    ADDITIONAL PROBABLE CAUSE RELATED TO ELECTRONIC DEVICES AND FORENSIC ANALYSIS

25.    Based on my training and experience, and discussions with other law enforcement personnel, I am aware that it is common for perpetrators of narcotics-related crimes to use electronic devices to obtain information for the execution of their crimes or to disseminate information to other individuals.  I am aware that perpetrators will keep tools, implements, financial statements, photographs, access devices, and stolen items close to themselves (especially in electronic devices, vehicles, on their

AFFIDAVIT

9

person, in their residences, and in storage units). They also maintain such in areas in which they have access to ensure custody and control of the items and for easy access for use or disposal.

26.    Based on my training and experience, my conversations with other law enforcement personnel, and my knowledge of the investigation in this case, I am aware that persons involved in narcotics-related crimes, along with their co-conspirators/accomplices, use cellular phones to communicate with one another, either by voice calls, emails, or text messages regarding their activities.  In this case, for example, I believe TOWNER had to communicate in some for with Felicia Trotter and/or Nathan Pappas in order to coordinate the amount of methamphetamine for the deals on February 17 and 26, as well as the date, time, and location of the deals.  I believe evidence of the drug trafficking conspiracy between TOWNER, Trotter, Pappas, and others may be discovered on the **Subject Devices**.

27.    I know that perpetrators who use such devices commonly exchange real time information about their activities. Such information can be found stored in the text/email messages and images on such devices.

28.    Such persons also use the devices to link with the internet to obtain addresses, maps, locations, track parcels containing narcotics, and to complete financial transactions related to their crimes. Such devices can also be used to distribute the proceeds of illegal activities to co-conspirators via banking and money-transfer applications.

29.    Based upon my training and experience, my conversations with other law enforcement, and my knowledge of the investigation in this case, I am aware that the complete contents of text messages, image files, and emails may be important to establishing the actual user who has dominion and control of a particular phone or computer at a given time.

a)    Cell phones may be subscribed to under false names with little to no verification by the service provider.  Cell phones and computers may also be used by multiple people.

b)    Given the ease with which such items may be obtained and used, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of a particular cell phone or device that was used to send a

AFFIDAVIT

10

particular text or email message, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular cell phone or device.

c) Often, by piecing together information contained in the contents of the device (cell phone or computer or storage device), an investigator can establish the identity of the actual user.

d) Often, those pieces will come from a time period before the device was used in criminal activity.

e) Limiting the scope of the search for information showing the actual user of the device would, in some instances, prevent the government from identifying the user of the device and, in other instances, allow a defendant to possibly suggest that someone else was responsible.

f) Therefore, the entire content of a communication device often provides important evidence regarding the actual user's dominion and control of the device.

g) Moreover, review of the contents of communications of electronic storage devices, including text and email messages sent or received by the subject device, assist in determining whether other individuals had access to the device.

30. Based upon my training and experience, my conversations with other law enforcement personnel assisting in this case, and my investigation in this case, I am aware that criminals discussing their criminal activity via electronic communication devices (email and text messaging) may use images, slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of text message conversations to determine their true meaning) when discussing their crimes.

a) They can also discuss aspects of the crime without specifically mentioning the crime involved.  It is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face

AFFIDAVIT

11

inserted into the content of a text message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parentheses :) to convey a smile or agreement) to discuss matters.

b) "Keyword searches" or other automated methods of review of the text messages sent to and from the subject device would not account for any of these possibilities, so actual review of the text and email messages by law enforcement personnel with information regarding the identified criminal activity is necessary to find all relevant evidence.

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on an electronic device. This information can sometimes be recovered with forensics tools.

a) I am aware that even if a perpetrator deletes evidence of criminal activity from electronic storage devices, the evidence often can be recovered from the devices, including computers or other forms of electronic storage media.

b) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are

AFFIDAVIT

12

overwritten.

d) In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Wholly apart from user-generated files, computer storage media - in particular, computers' internal hard drives - contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.

e) To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

f) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

## VI.    AUTHORIZATION REQUEST

32. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33. There is probable cause to believe that things that were once stored on the **Subject Devices** may still be stored there, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file

AFFIDAVIT

13

does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)    Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d)    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of one or more of the Target Offenses, but also forensic evidence that establishes how the **Subject Devices** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

a)    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b)    Forensic evidence on a device can also indicate who has used or controlled

AFFIDAVIT

14

the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f)    I know that when an individual uses an electronic device to commit a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

35.    Nature of examination.  Based on the foregoing, and consistent with Rule

AFFIDAVIT

15

41(e)(2)(B), the warrant I am applying for would permit the examination of **Subject Devices** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Subject Device** to human inspection in order to determine whether it is evidence described by the warrant.

36.    Manner of execution.  Because this portion of the warrant—seeking forensic examination of electronic devices found—seeks only permission to examine devices already in law enforcement's possession, the execution of the forensic examination would not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of such examination at any time in the day or night.

AFFIDAVIT

16

## VII.   AUTHORIZATION REQUEST

37.    Based on the facts set forth in this affidavit, I believe there is probable cause to believe that David TOWNER violated 21 U.S.C. § 841(a)(1) (distribution of a controlled substance), and 21 U.S.C. § 846 (conspiracy to distribute a controlled substance) and there is a fair probability that he used the **Subject Devices** to facilitate and/or further those violations of federal law. Accordingly, I respectfully request the issuance of a search warrant authorizing the search of the **Subject Devices** described in Attachment A-1 and Attachment A-2 and the seizure of the items described in Attachment B.

38.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,

/s/
Thomas Barton
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
telephonically on:

March 31, 2026

HONORABLE CAROLYN K. DELANEY
CHIEF U.S. MAGISTRATE JUDGE

/s/ *Jason Hitt*
Approved as to form by AUSA JASON HITT

AFFIDAVIT

17

## ATTACHMENT A-1
### Property to Be Searched

One light silver Apple iPhone in a red case, found during the search warrant execution at 1851 Danbrook Drive, Sacramento, California, on top of the bed in the master bedroom, currently stored in law enforcement custody at 10151 Croydon Way, Sacramento, California 95827.

This warrant authorizes the forensic examination of the **Subject Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-2
### Property to Be Searched

One gray Apple iPhone in a brown case, found during the search warrant execution at 1851 Danbrook Drive, Sacramento, California, on top of the master bathroom counter, currently stored in law enforcement custody at 10151 Croydon Way, Sacramento, California 95827.

This warrant authorizes the forensic examination of the **Subject Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
### Particular Things to be Seized

1.      All records on the Subject Device described in Attachment A that relate to violations of 21 U.S.C. §§ 846, and 841(a)(1), by David TOWNER and his co-conspirators known and unknown to investigators, including:

a.   Lists of customers and related identifying information;

b.   Types, amounts, and prices of narcotics trafficked as well as dates, places, and amounts of specific transactions;

c.   Any information related to sources of narcotics (including names, addresses, phone numbers, or any other identifying information);

d.   All bank records, checks, credit card bills, account information, and other financial records;

e.   Records relating to the acquisition and distribution of narcotics, tools and/or equipment associated with narcotics, including ATF Forms 4473, books, receipts, invoices, notes, bills of sale, ledgers, and pay/owe sheets;

f.   Any items, images, documents, communications, records, and information pertaining to or involved in the possession, manufacture, or distribution of narcotics;

g.   Any records of incoming, outgoing calls, and missed call history, which would include the number associated with the phone, numbers dialed, calls received, time of calls, and duration of calls;

h.   Any incoming and outgoing recorded messages and stored voicemail messages;

i.   Any records of "contacts" stored in the telephone, such as stored names, telephone numbers, e-mail addresses, and other identifying contact information;

j.   Any incoming, outgoing, or draft text messages;

k.   Any photographs, video recordings, and audio clips;

l.   Stored reminders, memos, notes, documents, and lists;

m.   Any records of appointments and/or reminders annotated on a calendar;

n.   Evidence and records relating to the use of any mailing or mail shipping service, including records of receipts, correspondence, tracking numbers, subscriptions, and payment information;

o. Documentation or evidence related to the storage of narcotics, including rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them;

p. Photographs, video recordings, audio clips, documents and records related to names and personal identifying information used by TOWNER;

q. All location data, including metadata of photos and social media posts, Wi-Fi logs, and data associated with installed applications;

r. Evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

s. Passwords used to access the electronic data described above.

2. Evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| One light silver Apple iPhone in a red case, and one gray Apple iPhone in a brown case, currently in possession of law enforcement located at 10151 Croydon Way, Sacramento, California 95827 | ) ) ) ) ) ) | Case No.   2:26-sw-0290 CKD |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1 and A-2, attached here and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached here and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 14, 2026 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐   for   30   days *(not to exceed 30)* ☐   until, the facts justifying, the later specific date of _____ .

Date and time issued:      March 31, 2026 at 1:56 pm                    *Carolyn K. Delaney* (signature)
_____
*Judge's signature*

City and state:      Sacramento, California            Carolyn K. Delaney, Chief U.S. Magistrate Judge
_____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                              Date

## ATTACHMENT A-1
**Property to Be Searched**

One light silver Apple iPhone in a red case, found during the search warrant execution at 1851 Danbrook Drive, Sacramento, California, on top of the bed in the master bedroom, currently stored in law enforcement custody at 10151 Croydon Way, Sacramento, California 95827.

This warrant authorizes the forensic examination of the **Subject Devices** for the purpose of identifying the electronically stored information described in Attachment B.

### ATTACHMENT A-2
**Property to Be Searched**

One gray Apple iPhone in a brown case, found during the search warrant execution at 1851 Danbrook Drive, Sacramento, California, on top of the master bathroom counter, currently stored in law enforcement custody at 10151 Croydon Way, Sacramento, California 95827.

This warrant authorizes the forensic examination of the **Subject Devices** for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**
## **Particular Things to be Seized**

1. All records on the Subject Device described in Attachment A that relate to violations of 21 U.S.C. §§ 846, and 841(a)(1), by David TOWNER and his co-conspirators known and unknown to investigators, including:

   a. Lists of customers and related identifying information;

   b. Types, amounts, and prices of narcotics trafficked as well as dates, places, and amounts of specific transactions;

   c. Any information related to sources of narcotics (including names, addresses, phone numbers, or any other identifying information);

   d. All bank records, checks, credit card bills, account information, and other financial records;

   e. Records relating to the acquisition and distribution of narcotics, tools and/or equipment associated with narcotics, including ATF Forms 4473, books, receipts, invoices, notes, bills of sale, ledgers, and pay/owe sheets;

   f. Any items, images, documents, communications, records, and information pertaining to or involved in the possession, manufacture, or distribution of narcotics;

   g. Any records of incoming, outgoing calls, and missed call history, which would include the number associated with the phone, numbers dialed, calls received, time of calls, and duration of calls;

   h. Any incoming and outgoing recorded messages and stored voicemail messages;

   i. Any records of "contacts" stored in the telephone, such as stored names, telephone numbers, e-mail addresses, and other identifying contact information;

   j. Any incoming, outgoing, or draft text messages;

   k. Any photographs, video recordings, and audio clips;

   l. Stored reminders, memos, notes, documents, and lists;

   m. Any records of appointments and/or reminders annotated on a calendar;

   n. Evidence and records relating to the use of any mailing or mail shipping service, including records of receipts, correspondence, tracking numbers, subscriptions, and payment information;

o. Documentation or evidence related to the storage of narcotics, including rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them;

p. Photographs, video recordings, audio clips, documents and records related to names and personal identifying information used by TOWNER;

q. All location data, including metadata of photos and social media posts, Wi-Fi logs, and data associated with installed applications;

r. Evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

s. Passwords used to access the electronic data described above.

2. Evidence of user attribution showing who used or owned the **Subject Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.